IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 4:24-cr-028 |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM JACK BERG, | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

**INTRODUCTION**

On March 19, 2024, the government obtained a fifteen-count indictment charging the defendant, William Jack Berg, with fourteen acts of wire fraud on specific dates in 2020, 2021, and 2022, in violation of 18 U.S.C. § 1343 (counts one through fourteen); and one count of money laundering over $10,000, in violation of 18 U.S.C. § 1957 (count fifteen). On June 10, 2024, Mr. Berg formally accepted responsibility by pleading guilty to counts nine and fifteen, pursuant to a written plea agreement that calls for dismissal of the remaining counts at the time of the sentencing. The Court accepted his guilty pleas on July 9, 2024.

The presentence report drafter determined that the offenses are grouped under the advisory sentencing guidelines because one of the counts embodies conduct that is treated as a specific characteristic or adjustment of the other, pursuant to USSG §3D1.2(c).[1] (PSR ¶145). Mr. Berg's base offense level under the advisory sentencing guidelines is 7, pursuant to the wire

---

[1] Counsel notes that the money laundering guideline, USSG §2S1.1 n.6, states that: "In a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped together pursuant to subsection (c) of § 3D1.2 (Groups of Closely-Related Counts)."

fraud count. (PSR ¶146). Because the loss amount under the guidelines exceeded $1,500,000 but is less than $3,500,000, sixteen additional levels were added. (PSR ¶147). Because the offense resulted in substantial financial hardship to five or more victims, four additional levels were added pursuant to USSG §2B1.1(b)(2)(B). (PSR ¶147a). Because the offense conduct involved sophisticated means, two more levels were added. (PSR ¶147b). Because Mr. Berg abused a position of private trust in a manner that significantly facilitated commission of the offense, two more levels were added. (PSR ¶149). After applying a three-level reduction for acceptance of responsibility (PSR ¶¶153–154) and calculating his criminal history category as I (PSR ¶159), the presentence report drafter found a total offense level of 28, and an advisory sentencing guideline range of 78 to 97 months of imprisonment. (PSR ¶207). The government appears to additionally contend that adjustments under USSG §3A1.1 for vulnerable victim, and USSG §3C1.1 for obstruction of justice, should apply. The parties agree and recommend that restitution in the amount of approximately $1,643,150.27 should be imposed. (PSR ¶141). The ultimate issue before the Court is what sentence is "sufficient, but not greater than necessary" under the 18 U.S.C. § 3553(a) factors in this case.

## ADVISORY GUIDELINE ISSUES

It is anticipated that the government will maintain that a vulnerable victim enhancement should apply to the advisory guideline calculation. The enhancement applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim. . . ." USSG §3A1.1(b)(1). The commentary to the guideline further clarifies that a vulnerable victim is a person "who is *unusually* vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id*. n.2. Here, as noted in the presentence report and referenced below, the victims of Mr. Berg's offense were retirees and

2

people planning for retirement, who ranged from approximately 55 to 88 years of age. As noted by the Probation Officer in the addendum to the presentence report, and undisputed by the defense, the victims lacked sophisticated knowledge of financial matters. But it is not clear that any victims' age in and of itself is what made them unusually vulnerable to the fraud perpetrated by Mr. Berg in this case. As noted by the Probation Officer, their lack of financial sophistication and knowledge made them vulnerable, but that conduct is encompassed by the application of the sophisticated means specific offense characteristic in the offense level calculation in the case.[2]

    It is further anticipated that the government will maintain that an enhancement for obstruction of justice is warranted, based on Mr. Berg having manually shredded and attempted to discard documents related to his victims after he had failed to surrender to law enforcement officials. The Probation Officer takes the position in the addendum that Mr. Berg's attempt to destroy evidence was "in essence, contemporaneous[] with arrest" such that it falls under the commentary indicating the enhancement is ordinarily not warranted. Counsel must acknowledge, however, that "material" is defined in USSG §3C1.1 n.6 in the same way the law considers "relevance," making it a broad term. Counsel must further acknowledge that the examples in USSG §3C1.1 n.4 of conduct "contemporaneous with arrest" are much more close in time than what occurred in this case. While still an impulsive act motivated by fear and panic, there remains a difference between swallowing or flushing drugs as police are banging on the door and shredding and attempting to dispose of documents after generally learning that one has been requested to turn themselves in to the authorities. The relevant legal authority appears to

---

[2] In the event the Court believes the vulnerable victim enhancement should apply, the defense would respectfully argue that the overlap between the vulnerability based on age and any vulnerability based on lack of financial knowledge can be addressed as part of the overall 18 U.S.C. § 3553(a) analysis.

3

require the destruction of evidence to actually occur at the same moment the arrest is being attempted. While the defense agrees with the Probation Officer that it does not appear that the documents provided any material *hindrance* to the prosecution in this case, the hindrance question is not reached without the contemporaneity. That said, the lack of hindrance to the actual investigation or prosecution can be accounted for in the sentencing determination under the 18 U.S.C. § 3553(a) factors, given that the guideline equally punishes both an actual hindrance and an immaterial one when material evidence is destroyed.

## ARGUMENT

William Berg has worked in the insurance industry throughout his adult lifetime. (PSR ¶¶189, 193–197). He is familiar with nearly every type of product being offered in the insurance industry over the years. Since 2003, he has worked in the industry with various agencies as an insurance agent or broker, and also as a self-employed agent and broker. (PSR ¶¶12, 193). When self-employed, he utilized the business entities of Berg Insurance Advocates Incorporated (from 2011), W Holdings of Iowa, LLC (registered in February of 2019), and also did business under the name Excel Performance Management. *Id*. He was born in Cedar Falls, Iowa, and has lived in Iowa his entire life except for a seven-year period when he moved to Topeka, Kansas. (PSR ¶¶164, 174).

Mr. Berg grew up in a middle-class family, and was active in sports, Cub Scouts, and had a newspaper route. (PSR ¶164). His father was a wounded Korean War veteran who struggled with infections in his legs related to his injuries, and then required a quadruple bypass heart surgery when Mr. Berg was thirteen years old. (PSR ¶¶164, 168). His mother was a nurse, but after his father's heart surgery Mr. Berg felt obligated to help her care for his father. (PSR ¶¶165,

169). This led to him attending college in Cedar Falls so he could continue to help at home. (PSR ¶¶165, 186).

In 1999, Mr. Berg married and started a family. (PSR ¶173). The marriage was happy for many years and produced two daughters. *Id*. Mr. Berg's older daughter has Down Syndrome, for which she requires assistance with bathing, medications, meals, and daily safety and social skills. *Id*. Mr. Berg utilized the care skills he had learned from helping his father to transition to providing care for his daughter. (PSR ¶166). This meant that he found ways to primarily work from home so he could provide care and would take the lead on household and school matters while his wife worked outside the home during the day. *Id*. He has never had any major problems with drugs or alcohol, and apart from an operating while intoxicated offense when he was in college, had no significant personal or legal problems in his life for decades. (PSR ¶¶158, 166).

But in September of 2019, Mr. Berg's father passed away. (PSR ¶168). His mother, who had suffered from Alzheimer's disease and breast cancer, also died the next day. (PSR ¶169). Both had been in hospice care for six months prior to their deaths, and their passing together had a major emotional impact on Mr. Berg. (PSR ¶167). At the same time, his marriage was ending, as the relationship between he and his wife had turned into more like "roommates" and they had drifted apart and ultimately separated formally in 2020. (PSR ¶173). Over this same time period, Berg Insurance Advocates was wrapping up, and Mr. Berg was purporting to be building up the W Holdings of Iowa LLC business entity.[3] (PSR ¶193). Mr. Berg "hit rock bottom," and was

---

[3] Although the majority of Mr. Berg's fraud occurred in 2019 through 2022, the evidence indicates he started misallocating and/or not investing client funds in some instances back to 2016.

"tor[n] apart" by this avalanche of events hitting at the same time. (PSR ¶¶165, 167).  His mental health deteriorated, he withdrew from contact with his siblings and other family members, and lost sight of the type of person he wanted and had been raised to be. (PSR ¶¶166, 180–181).

Mr. Berg began utilizing his clients' funds like they were his own. (PSR ¶12).  He had been convincing his clients to invest money in the W Holdings and Excel Performance entities but was not disclosing that these were not established investment companies, that he was the only individual directly associated with them, and even claimed they were "old stable companies" to one client who asked questions. (PSR ¶¶12, 18, 30, 61, 117).  Dozens of clients gave Mr. Berg checks to invest in the companies, but Mr. Berg placed those funds in his business accounts and instead utilized them to rebuild a life for himself after his separation and divorce. (PSR ¶¶12, 15, 20, 32, 41, 43–44, 46–47, 66, 70, 75, 80, 84, 87, 93, 98, 100, 106, 116, 119–120, 125, 133).  The entire endeavor quickly turned into a Ponzi-type scheme, wherein Mr. Berg would induce his clients to keep providing money—sometimes by promising high rates of return or utilizing promissory notes—and he would improperly use the money to live off, to pay clients that were asking questions about false "dividends," and repay high-interest personal loans he had taken out for his own benefit. (PSR ¶¶12, 23, 26, 30–31, 33–35, 40–41, 46–47, 56, 59–60, 71, 85, 87, 93, 118, 120–121, 126, 135–136).  This also included using client funds to purchase custom jewelry and provide an impressive lifestyle for the woman he was in a relationship with from 2021 until his arrest in this case, which underlies the money laundering offense. (PSR ¶¶46–47, 172, 192).

When clients would ask questions about their investments, Mr. Berg sometimes provided them with fake documentation, including fabricated account statements and tax documents. (PSR ¶¶13, 21–22, 41, 43, 57, 67–68, 76–77, 79, 94, 99, 131, 134).  He also would speak with clients

and convince them to trust him, only to then delay, dissuade, lie, ignore, or seek new funds to provide them to keep them at bay when they started asking questions later. (PSR ¶¶13, 25, 26, 31, 54, 108–109, 111). Based on Mr. Berg's suggestions and claims, over a dozen victims provided him with funds totaling over $2 million dollars. (PSR ¶14). Many of the victims of his fraud surrendered existing insurance and annuity policies or withdrew from retirement accounts to provide Mr. Berg with funds, which sometimes resulted in them incurring surrender fees and being taxed. (PSR ¶¶14, 19, 51–52, 55, 65, 78, 86, 98, 105, 110, 115, 129, 131).

In July of 2023, the FBI interviewed Mr. Berg at his attorney's office in Des Moines. (PSR ¶138a). Mr. Berg pled ignorance as to why his clients would be upset with him, and then invoked his right to remain silent. *Id*. The FBI subsequently attempted to have Mr. Berg surrender in March of 2024, but after claiming he would do so on several occasions, he fled instead. (PSR ¶¶138b–c). After looking for him at his residence, the FBI located around 70 pages of hand-shredded documents related to Mr. Berg's dealings with his victims in the trash receptacle in the driveway. (PSR ¶138d). Mr. Berg apparently was a "mess," and made a half-hearted suicide attempt before being located and arrested a few days later in Merriam, Kansas without further incident. (PSR ¶¶138e, 181). He came to terms with what he did and that he must face the consequences for it. He subsequently waived his right to a detention hearing at his initial appearance, entered a timely guilty plea in the case, and has continued to accept responsibility for his offenses throughout the pendency of the case.

The question before the Court is now what sentence is "sufficient, but not greater than necessary" to impose on Mr. Berg for the fraud he perpetrated. Mr. Berg is deeply ashamed about what he did. (PSR ¶166). There is no dispute in this case that he abused his position of trust to steal monies from financially unsophisticated people that believed him and were

depending on him to help make their lives financially secure.  Mr. Berg went against the values that were instilled in him and that he had displayed throughout his life and hurt people for his own personal benefit.  While he may have been mentally and emotionally in turmoil as the life he had led for many years collapsed, that does not excuse his conduct, and indeed his offense behavior certainly further contributed to those feelings over the past few years.

While the scope of this offense is very serious because it occurred over several years, involved a substantial amount of money, and significantly damaged the finances of a number of people who were retired or planning for their retirement years, Mr. Berg also has minimal criminal history.  His only prior conviction consists of a 1995 arrest for operating while intoxicated when he was 23 years old, for which he received a deferred judgment and successfully discharged probation. (PSR ¶158).  He is now 52 years old, has depression and anxiety for which he has been prescribed medications in the past,[4] but does not suffer from drug or alcohol problems. (PSR ¶¶164, 180–181, 184).  While significant in scope, his offense behavior is aberrant in what otherwise has been an admirable life.  He knows he must face further punitive sanction for what he has done by losing his liberty and knows he should stay out of the financial field when he eventually goes on to supervised release and works toward repayment to the best of his ability. (PSR ¶190).

Along with the imprisonment sanction the Court will impose on Mr. Berg for his crimes, he has now lost the ability to be physically present for his daughters, and his youngest one is so devastated by his actions that she refuses to speak to him. (PSR ¶173).  While he has now begun

---

[4] Although not recommended in the final presentence report, counsel believes a mental health evaluation may be beneficial for Mr. Berg.  This is due to both the suicidal ideation and mental health issues noted in the report, and also due to the potential impact of unaddressed traumas on Mr. Berg's psyche.

to renew a relationship with his siblings, they are about all Mr. Berg has for support at this point in his life, and he understands that is due to his own actions and the disgrace that comes with them. Although he cannot undo what he did, the fact that he is ashamed of himself shows that he can be deterred. He has the characteristics of someone that will respond well to correctional and rehabilitative treatment, and who can take accountability for his behavior. He recognizes the seriousness of his offense, deeply regrets his actions, and fully accepts responsibility for his conduct. He does not pose any particular future threat to the public that necessitates him being incapacitated by an extremely long term of incarceration, and the Court has a wide variety of options available to utilize in crafting a sufficient, but not greater than necessary sentence for him in this case that reflects the seriousness of the offense, promotes respect for the law, and provides a just punishment. *See* 18 U.S.C. § 3553(a)(2)(A)–(C).

     The advisory sentencing guidelines as calculated in the final draft of the presentence report recommend a sentence of from 78 to 97 months of imprisonment be imposed in this case. But regardless of what the Court determines the advisory guideline range to be, the overarching legal question is what sentence is "sufficient, but not greater than necessary" under 18 U.S.C. § 3553(a). The individual history and characteristics of an individual are not factors that are easily quantified, are largely not factored into the calculus of the advisory guidelines for that reason and are therefore left for consideration under 18 U.S.C. § 3553(a)(1) when making the final sentencing determination. While the Court must also consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct under 18 U.S.C. § 3553(a)(6), that requirement is fulfilled by considering the advisory sentencing range and then tailoring the sentence based on the other factors unique to the case and individual being sentenced. *See Gall v. United States*, 552 U.S. 38, 54–56 (2007)

(approving the district court's analysis of why a below-guideline sentence for the particular defendant under the circumstances of the case did not violate the requirement to avoid unwarranted sentencing disparities); *see also Rita v. United States*, 551 U.S. 338, 348 (2007) (observing that the sentencing commission attempts to fulfill the 18 U.S.C. § 3553(a) objectives at "wholesale," while the sentencing judge does so at "retail."). Mr. Berg acknowledges the seriousness of his offense and his moral and legal failings, is remorseful for what he has done and accepts responsibility for his actions. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). He will accept the sentence the Court assesses under the section 3553(a) factors, and regardless of what that is, he will work toward making amends as best as he can in the future.

Respectfully submitted,

*/s/ Joseph Herrold*
Joseph Herrold, Assistant Federal Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610
FAX: (515) 309-9625
E-MAIL: joe_herrold@fd.org
ATTORNEY FOR THE DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2024, I electronically filed this document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

*/s/ Theresa McClure*, Paralegal